# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

BONNIE SAVOY,

    Petitioner,      Case Number: 2:08-CV-13541

v.              HONORABLE PAUL D. BORMAN
                UNITED STATES DISTRICT JUDGE
HEIDI WASHINGTON,

    Respondent.
              /

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY

Petitioner Bonnie Savoy filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner, currently in the custody of the Michigan Department of Corrections, challenges her conviction for first-degree premeditated murder on the ground that insufficient evidence was presented to support her conviction. For the reasons discussed below, the Court denies the petition.

### I. Facts

Petitioner's conviction arises from the death of her husband, Jerry Savoy, from an insulin overdose. Mr. Savoy, who suffered from multiple sclerosis, was admitted to Spectrum Hospital in Grand Rapids, Michigan, on March 10, 2003, and died nine days later.

Dr. James Hoekwater, a pulmonary critical care doctor, testified that he was present when Mr. Savoy was admitted to the hospital on March 10, 2003. It was discovered that Mr. Savoy had very low blood sugar, apparently caused by a high insulin level. Mr. Savoy's insulin level was in the 700s. A normal insulin level is less than 14. Based upon Mr. Savoy's high insulin

level and low c-peptide level, Dr. Hoekwater concluded that the insulin was injected into Mr. Savoy. Dr. Hoekwater was suspicious about the circumstances of Mr. Savoy's high insulin level, and passed that suspicion on to James Vanderpols, a security officer for Spectrum Health. Vanderpols, in turn, contacted the Cedar Springs Police Department.

Dr. Peter Gobel testified that he was Mr. Savoy's personal physician. Mr. Savoy suffered from multiple sclerosis. Dr. Gobel testified that Mr. Savoy had no medical history of diabetes and was not prescribed insulin. In January 2003, Mr. Savoy was hospitalized for low blood sugar. Dr. Gobel attributed this low blood sugar to alcohol consumption and Mr. Savoy's chronic medical condition. Dr. Gobel did not believe that this incident was related to or caused by the same precipitating factors as the low blood sugar level detected on March 10, 2003.

Dr. David Start, a forensic pathologist, testified that he conducted an autopsy on Mr. Savoy on March 19, 2003. Dr. Start determined the cause of death to be a complication of hypoglycemia coma, which occurs when blood sugar drops to dangerously low levels caused by an insulin overdose. He testified that the insulin overdose was caused by an outside source.

Cedar Springs Police Officer Paul Feutz testified that he assisted in conducting a search of the Savoy's home. He found insulin in a teapot in the kitchen.

Mr. Savoy's mother, Marilyn Savoy, testified that she had never known her son to be diabetic or use insulin. She testified that in the year preceding his death Mr. Savoy and Petitioner were struggling financially and were going to lose their home. She characterized their situation as desperate.

Christopher Davis testified that, on March 9, 2003, he was living with Bonnie and Jerry Savoy because he had lost his apartment. He was dating Petitioner's daughter, Angela

Holtzlander. He arrived home at approximately 9:00 p.m., and noted that Mr. Savoy, who was seated in a recliner in the living room, appeared to be awake because his eyes were open, but he was unresponsive. Davis asked Petitioner whether Mr. Savoy was okay. She told him that Mr. Savoy had just taken his medicine and would be fine. Davis ate dinner and then began playing video games in the dining room. Davis stayed at the computer for several hours, never noticing any movement from Mr Savoy. Petitioner went to bed at approximately 11:00 p.m. Before she did so, she put a blanket on Mr. Savoy. Mr. Savoy did not respond when she did so. Fifteen or twenty minutes after Petitioner went upstairs, Mr. Savoy began snoring very loudly, as if he were gasping for air. Davis called for Petitioner to come downstairs and asked whether they should call 911. Petitioner came downstairs, checked on Mr. Savoy and said he would be fine. She then went back to bed. Davis testified that Petitioner came back downstairs in the morning and called 911. She offered no explanation as to why she called 911 in the morning, but had not thought it necessary to call the night before.

Fern Holtzlander testified that she is married to Petitioner's son Jason. Fern testified that, on March 13, 2002, Petitioner asked her if she knew any drug dealers because she wanted to give something to Mr. Savoy so that he would not wake up. Fern testified that Petitioner told her that she already had tried mixing Mr. Savoy's medications, putting air in his needles and giving him twenty sleeping pills, but he had still woken up. Fern did not notify the police at the time, but finally informed the police what Petitioner had said to her when she learned that Mr. Savoy was in the hospital.

Jason Holtzlander, Petitioner's son and Fern's husband, corroborated his wife's testimony. After his wife told him about Petitioner's questions to her, he confronted Petitioner.

3

Petitioner told him that Fern had misunderstood her and she was simply trying to get the information for her friend, Shirley.

Angela Holtzlander, Petitioner's daughter, testified that she was aware that Mr. Savoy and Petitioner were deeply in debt and in danger of losing their home. She further testified that within three or four months of Mr. Savoy's death, Petitioner was engaged to another man.

Heather Leuren testified that she was Mr. Savoy's daughter. She testified that she and her husband rushed to the hospital when they learned her father had been taken there. She further testified that over the next few days Petitioner gave conflicting accounts about what had happened. Leuren was with her father in the hospital when he died. She and Mr. Savoy's parents spent the night preceding his death in the hospital with him because doctors had told them that his death was imminent. Petitioner was not at the hospital when he died or the preceding night. Leuren spoke to Petitioner a few hours before he died and told her that Mr. Savoy was not doing well. Petitioner did not reach the hospital before Mr. Savoy died.

Numerous family members testified that, prior to Mr. Savoy's death, they were contacted by Petitioner or Mr. Savoy and asked to lend the couple money.

Police Officer Chad Potts testified that he investigated Mr. Savoy's death. He first interviewed Petitioner on March 28, 2003. Petitioner told him that, on March 9, 2003, Mr. Savoy tested his blood sugar and had a normal reading. That day was a good one and Mr. Savoy was acting well. Petitioner went to bed at about midnight and did not get up until the next morning, March 10, 2003, at approximately 5:30 a.m. She let the dogs outside. When she let them back inside, she noticed that they were in Mr. Savoy's lap, but he was not responding to them. Petitioner then tested his blood sugar and called 911. Officer Potts asked Petitioner

4

whether she knew anyone who was diabetic. She responded that the only person she knew who was diabetic was her grandmother. She also denied having any conversation with Fern Holtzlander in which she asked whether Fern knew anyone who could supply her with drugs.

Officer Potts further testified that a search warrant was executed at Petitioner's home on April 5, 2003. Officer Potts interviewed Petitioner while the search warrant was executed. In this second interview, Petitioner stated that she did not sleep through the night as she had originally stated because Christopher Davis woke her up in the evening when Mr. Savoy began making strange noises. Officer Potts questioned her about Fern Holtzlander's statement that Petitioner had asked her whether she knew someone who could supply drugs so Petitioner could put Mr. Savoy to sleep for good. Petitioner stated that this had been a misunderstanding. The person who was actually looking for the drugs was Ruth Hagen.

On April 6, 2003, Officer Potts went to Petitioner's home to question her about insulin that was found in a teapot when the search warrant was executed. She denied knowing anything about the insulin and denied knowing anyone who was diabetic. A day or two later, Petitioner dropped off several letters and lists for Officer Potts at the police department. These handwritten notes included a list, numbered one through ten, of things that were upsetting and depressing to Mr. Savoy. Another note stated that she had forgotten that the insulin in her home belonged to Wendy Andrews. Andrews, a diabetic, had left the insulin at her house the prior November or December. She also identified Diana Frens as a cousin who is diabetic. In another letter, she explained that she asked Fern Holtzlander for drugs on behalf of Ruth Hagen, who was involved in a bad marriage and was interested in putting her husband to sleep so he would never wake up.

Officer Potts interviewed Ruth Hagen. Hagen denied ever asking Petitioner to obtain

5

drugs for her to use on her husband.

Officer Potts also interviewed Diana Frens. Frens stated that she uses insulin and that Petitioner had access to her home because Petitioner cares for her dogs and helps clean her home. It was later determined that the insulin used by Frens was the same type found in the teapot in Petitioner's home.

Wendy Andrews testified that she was a diabetic and lent her glucose meter to Petitioner in January 2003 because Petitioner told her that Mr. Savoy might be suffering from diabetes. She denied ever supplying Petitioner with any insulin. At one time, Petitioner asked Andrews for some insulin because she believed Mr. Savoy might be diabetic. Andrews told Petitioner taking someone else's insulin would be unsafe and denied the request.

Ruth Hagen testified that Petitioner is her first cousin. A few days after Mr. Savoy's death, Petitioner called her and asked if she would sign a statement for police saying that she had asked Petitioner what she could give her husband to kill him. Hagen testified that she was scared and upset by the request and told Petitioner she would think about it.

Two witnesses testified for the defense. Shirley Hall testified that she and Petitioner had been friends since they were babies. She testified that, prior to his death, Mr. Savoy was very depressed. He was depressed about his physical condition and their financial situation.

Michael Verduin testified that he has known Petitioner all his life and that he met Mr. Savoy approximately five or six years prior to his death. He testified that on two separate occasions Mr. Savoy told him that he was thinking about killing himself.

## II. Procedural History

Following a jury trial in Kent County Circuit Court, Petitioner was convicted of first-

degree premeditated murder. On March 29, 2006, she was sentenced to life imprisonment without parole.

Petitioner filed an appeal of right in the Michigan Court of Appeals, raising a single claim for relief:

> While there was evidence proving that Jerry Savoy died of an overdose of injected insulin, there was insufficient evidence to prove beyond a reasonable doubt that defendant was responsible for his death.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Savoy*, No. 269813 (Mich. Ct. App. Dec. 20, 2007).

Petitioner sought leave to appeal in the Michigan Supreme Court. The Michigan Supreme Court denied leave to appeal. *People v. Savoy*, No. 135659 (Mich. March 24, 2008).

Petitioner then filed the pending petition for a writ of habeas corpus. She raises the same claim raised in state court.

### III. Standard of Review

28 U.S.C. § 2254(d) imposes the following standard of review on federal courts reviewing applications for a writ of habeas corpus:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). Therefore, federal courts are bound by a state court's adjudication of a

7

petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429 (6th Cir. 1998). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1)[1]; *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir. 1995) ("We give complete deference to state court findings unless they are clearly erroneous").

The United States Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

With respect to the "unreasonable application" clause of § 2254(d)(1), the United States Supreme Court held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause when "a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." Id. at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should

---

[1] 28 U.S.C. § 2254(e)(1) provides, in pertinent part:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.

8

ask whether the state court's application of clearly established federal law was objectively unreasonable. . .

[A]n unreasonable application of federal law is different from an incorrect application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409-11.

### IV. Analysis

Petitioner presents a single claim for habeas corpus relief. She argues that insufficient evidence was presented to support her first-degree premeditated murder conviction.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). On direct review, review of a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). In the habeas context, "[t]he *Jackson* standard must be applied 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006), *quoting Jackson*, 443 U.S. at 324 n.16. "Two layers of deference apply to habeas claims challenging evidentiary sufficiency." *McGuire v. Ohio*, 619 F.3d 623, 631 (6th Cir. 2010), *citing Brown v. Konteh*, 567 F.3d 191, 204-05 (6th Cir. 2009). First, the Court "must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential

9

elements of the crime beyond a reasonable doubt." *Brown*, 567 F.3d at 205, *citing Jackson,* 443 U.S. at 319. Second, if the Court were "to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, [the Court] must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Id.* "A reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003), *citing Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). "A reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel v. Brown*, __ U.S. __, 130 S. Ct. 665, 674 (2010), *quoting Jackson*, 443 U.S. at 326.

The Michigan Court of Appeals held that sufficient evidence was presented to sustain Petitioner's conviction, stating, in relevant part:

> First-degree murder requires an intentional killing of another that was willful, premeditated and deliberate. *People v. Bowman*, 254 Mich. App. 142, 151; 656 N.W.2d 835 (2002); *People v. Anderson*, 209 Mich. App. 527, 537; 531 N.W.2d 780 (1995); M.C.L. 750.316(1)(a). Premeditation and deliberation can be inferred from the circumstances surrounding the killing. *Id.*; *People v. Sounders*, 189 Mich. App. 494, 496; 473 N.W.2d 755 (1991). In addition to the statutory elements of murder, identity of the perpetrator must always be proven beyond a reasonable doubt to obtain a conviction. *People v Kern*, 6 Mich. App. 406, 409; 149 N.W.2d 216 (1967). "Circumstantial evidence and reasonable inferences arising therefrom can sufficiently establish the elements of a crime." *People v. Schultz*, 246 Mich. App. 695, 702; 635 N.W.2d 491 (2001), *citing People v. Jolly*, 442 Mich. 458, 466; 502 N.W.2d 177 (1993).
>
> Defendant does not challenge on appeal that Jerry died from a purposeful injection of an overdose of insulin, and medication that he did not take for his health problems. Defendant argues that the prosecution presented insufficient evidence from which a rational jury could conclude that defendant was the person who injected Jerry with the insulin. We agree with defendant that the prosecution

did not present evidence of an eyewitness to the injection, or any fingerprint or DNA evidence that tied defendant to the insulin vial. Nevertheless, after reviewing the record, it is clear that the prosecution presented sufficient circumstantial evidence from which a rational jury could conclude, beyond a reasonable doubt, that defendant injected the insulin.

A year before the murder, defendant asked her daughter-in-law for drugs that would put Jerry "to sleep and not wake up." Defendant admitted that she had tried mixing his medications and putting air in his needles. She admitted to previously giving him 20 sleeping pills at once, and commented that he "still woke up." Trial testimony showed that defendant always prepared a Betaserol solution for Jerry for his multiple sclerosis, and readied the syringe for injection, and she regularly injected the medication. A used insulin vial seized from defendant's home was similar to the other vials found in the possession of Diane Frens, defendant's good friend, and defendant had an opportunity to acquire a vial because she had the key to Fren's home. A reasonable inference could be drawn that defendant switched the Betaserol solution for insulin.

The insulin seized from defendant's home was in a teapot placed on a shelf that Jerry could not reach easily. Although Jerry could walk to the kitchen, he needed to use the walls and counters for support. The teapot was above a counter that Jerry could not use to steady himself. Further, the teapot belonged to defendant's grandmother and was ceramic, and the evidence revealed that Jerry no longer washed the dishes at home because he was prone to dropping and breaking them.

There was additional evidence in the record that defendant purposely delayed calling for emergency medical assistance for many hours after it was discovered that Jerry did not seem well. . . .

Finally, defendant's financial problems provided her with a motive to kill Jerry. She believed that if Jerry died, insurance would pay the home's mortgage and the pending foreclosure proceedings would be avoided. Although motive is not itself an element of first-degree murder, evidence of motive assists in establishing other elements of the crime, *People v. Herndon*, 246 Mich. App. 371, 412-413; 633 N.W.2d 376 (2001), including establishing the identity of the killer as defendant and as proof of her intent to kill.

Defendant argues that the strongest evidence against her was her various "recollections" of the events and that her conflicting statements are insufficient evidence to support her conviction. Defendant's changing statements were not, however, the only evidence against her. And, there was evidence that defendant fabricated various stories and was not simply confused that the defendant specifically asked her to tell police that the insulin was hers; that request was made after police found the insulin and after defendant denied several times that

11

> she knew anything about the insulin.
>
> In sum, viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence to convince a jury beyond a reasonable doubt, that defendant purposefully injected Jerry Savoy with insulin and committed first-degree premeditated murder.

*Savoy*, slip op. at 1-3.

In this case, the Court finds that the state court of appeals correctly set forth the elements of first-degree murder under Michigan law. "Circumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt." *Johnson v. Coyle*, 200 F.3d 987, 992 (6th Cir. 2000) (quotation omitted). The evidence presented, viewed in the light most favorable to the prosecution, shows that, prior to Mr. Savoy's death, Petitioner attempted to locate a drug that would permanently put her husband to sleep and that she or her husband contacted many friends and relatives and asked for money or bemoaned their desperate financial situation. Additionally, Petitioner did not seek prompt medical attention for Mr. Savoy when alerted that he was unresponsive and having apparent breathing difficulty. She gave conflicting statements to friends and police regarding her access to insulin and asked a friend to lie about the insulin found in her home. She wrote numerous letters to police investigating her husband's death which were contradictory and suspicious. This Court cannot say that the state court's conclusion – that this evidence was sufficient to establish first-degree murder under Michigan law – was contrary to or constituted an unreasonable application of federal law.

## V. Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability ("COA") is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings now requires that the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). A petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (citation omitted). In this case, the Court concludes that reasonable jurists would not debate the conclusion that the petition fails to state a claim upon which habeas corpus relief should be granted. Therefore, the Court will deny a certificate of appealability.

## VI. Conclusion

For the foregoing reasons, **IT IS ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the matter is **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.


S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: December 21, 2010

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on December 21, 2010.

              S/Denise Goodine
              Case Manager